# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 17-10663

————

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2019

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION

      Plaintiff

v.

STANFORD INTERNATIONAL BANK, LIMITED

      Defendant

v.

JOSEPH BECKER; TERENCE BEVEN; WANDA BEVIS;
THOMAS EDDIE BOWDEN; TROY L. LILLIE, JR., et al

      Movants - Appellants

DOUG MCDANIEL; SCOTT NOTOWICH;
EDDIE ROLLINS; CORDELL HAYMON; et al,

      Objecting Parties - Appellants

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

      Interested Parties - Appellees

RALPH S. JANVEY,

      Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;

No. 17-10663

ARCH SPECIALTY INSURANCE COMPANY,

> Plaintiffs - Appellees

v.

RALPH S. JANVEY, In his Capacity as Court Appointed Receiver for Stanford International Bank Limited, Stanford Group Company, Stanford Capital Managment L.L.C., Stanford Financial Group, and Stanford Financial Group Bldg,

> Defendant - Appellee

v.

CORDELL HAYMON,

> Intervenor - Appellant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

> Plaintiffs - Appellees

v.

CORDELL HAYMON,

> Objecting Party - Appellant

v.

RALPH S. JANVEY,

> Intervenor - Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

> Plaintiffs - Appellees

v.

2

No. 17-10663

RALPH S. JANVEY,

Intervenor Defendant - Appellee

v.

CORDELL HAYMON,

Objecting Party - Appellant
*********************************************

CORDELL HAYMON,

Third Party Plaintiff - Appellant

v.

CERTAIN UNDERWRITERS OF LLOYD'S OF LONDON, Claims asserted by Claude F. Reynaud, Jr.

Third Party Defendant - Appellee

v.

RALPH S. JANVEY,

Appellee

—————————

Appeals from the United States District Court
for the Northern District of Texas

—————————

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:

These appeals challenge the district court's approval of a global settlement between Ralph Janvey, the Receiver for Stanford International Bank and related entities, and various insurance company Underwriters, who issued policies providing coverage for fidelity breaches, professional indemnity, directors and officers protection, and excess losses. The settlement yielded $65

3

million for the Receiver's claims against the insurance policy proceeds, but it wipes out, through "bar orders," claims by coinsureds to the policy proceeds and their extracontractual claims against the Underwriters even if such claims would not reduce or affect the policies' coverage limits.  Among the parties whose claims were barred are Appellants comprising (a) two groups of former Stanford managers and employees; (b) Cordell Haymon, a Stanford entity director who settled with the Receiver for $2 million; and (c) a group of Louisiana retiree-investors.

A constellation of issues surrounding the global settlement is encapsulated in the question whether the district court abused its discretion in approving the settlement and bar orders.  Based on the nature of *in rem* jurisdiction and the limitations on the court's and Receiver's equitable power, we conclude the district court lacked authority to approve the Receiver's settlement to the extent it (a) nullified the coinsureds' claims to the policy proceeds without an alternative compensation scheme; (b) released claims the Estate did not possess; and (c) barred suits that could not result in judgments against proceeds of the Underwriters' policies or other receivership assets. Accordingly, we VACATE the district court's order approving the settlement and bar orders and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

The massive Stanford Financial Ponzi scheme defrauded more than 18,000 investors who collectively lost over $5 billion.  As part of a securities fraud lawsuit brought by the SEC, the district court appointed the Receiver "to immediately take and have complete and exclusive control" of the receivership estate and "any assets traceable" to it.  The court granted the Receiver "the full power of an equity receiver under common law," including the right to assert claims against third parties and "persons or entities who received assets or

records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The district court also held that the court possessed exclusive jurisdiction over a group of insurance policies and their proceeds, at issue in this case, and ruled that, other than a lawsuit involving the Stanford criminal defendants, "[n]o persons or entities may bring further claims related to the [Proceeds] in any forum other than" the district court. Neither of these latter two orders was timely appealed.

The policies issued to the Stanford entities covered, in different arrangements, losses and defense costs for the entities and their officers, directors and certain employees. At issue are the following policies: a Directors' and Officers' Liability and Company Indemnity Policy ("D&O"); a Financial Institutions Crime and Professional Indemnity Policy, including (a) first-party fidelity coverage for employee theft ("Fidelity Bond") and "[l]oss resulting directly from dishonest, malicious or fraudulent acts committed by an Employee," and (b) third-party coverage for professional indemnity ("PI Policy"); and an Excess Blended "Wrap" Policy ("Excess Policy"). The policy limits are as follows:

|  | **Stanford Bank Entities** | **Stanford Brokerage Entities** |
|---|---|---|
| **D&O Policy** | $5 million | $5 million |
| **PI Policy** | $5 million per Claim $10 million aggregate | $5 million per Claim $10 million aggregate |
| **Fidelity Bond** | $5 million per Loss $10 million aggregate | $5 million per Loss $10 million aggregate |
| **Excess Policy** | $45 million each Claim or Loss/$90 million aggregate | |

No. 17-10663

The maximum amount of remaining coverage is disputed. According to the district court, the Underwriters have paid some $30 million in claims under the policies for insureds' defense costs. Underwriters contend that only $46 million remains available because the losses resulted from a single event – the Ponzi scheme. The Receiver argues that the conduct implicates the aggregate loss limits up to $101 million of remaining coverage. The questions of coverage ultimately depend on the identity of the insureds under each policy and the nature of the claims, and these issues are hotly contested. The Stanford corporate entities are insured under all of the policies, but Stanford directors, officers, and employees are coinsureds only under the D&O, PI, and Excess policies.[1] Each policy is subject to multiple definitions and exclusions. After the Receiver made numerous claims for coverage under the policies (the "Direct Claims") that were met with Underwriters' denial based on policy exclusions, several lawsuits ensued.

The Receiver also pursued the policy proceeds indirectly by filing lawsuits (the "Indirect Claims") against hundreds of former Stanford directors, officers, and employees, alleging fraudulent transfers and unjust enrichment and/or breach of fiduciary duty. The Receiver obtained a $2 billion judgment against one former Stanford International Bank director and a $57 million judgment against a former Bank treasurer, both of whom were potentially covered under the policies. The Receiver continues to litigate similar claims against the coinsured Appellants who were Stanford managers and employees. *See, e.g.*, *Stanford International Bank, Ltd., et al., v. James R. Alguire, et al.*, No. 3:09-CV-0724-N (N.D. Tex., filed Dec. 18, 2019).

---

[1] There is no dispute that the Appellants here are coinsured under the noted policies, but *not* coinsured under the Fidelity bond. The chief dispute is about the effect of certain limitations and exclusions within the policies.

No. 17-10663

After eight years of sparring, the Receiver and Underwriters, together with the court-appointed Examiner on behalf of Stanford investors, mediated their disputes for several months in 2015. Mediation initially resulted in a Settlement Proposal under which the Underwriters agreed to pay the Receiver $65 million, and in return the Receiver would "fully release any and all insureds under the relevant policies." The purpose of the complete release was to shield the Underwriters from any policy obligations to defend or indemnify former Stanford personnel, including the employee Appellants, in the Receiver's Indirect Claim lawsuits. The parties almost immediately disagreed about the content of the settlement, however, and the Underwriters filed an Expedited Motion to Enforce the Settlement Agreement. The district court denied the motion and instructed the parties to continue negotiating. On June 27, 2016, the Receiver and Underwriters notified the court that they had entered into a new settlement agreement, which the Examiner supported.

Under this new settlement, the Underwriters again agreed to pay $65 million into the receivership estate, but the settlement required orders barring all actions against Underwriters relating to the policies or the Stanford Entities. Paragraph 35 of the settlement provides Underwriters the unqualified right to withdraw from the settlement if the court refuses to issue the bar orders. The bar orders were necessary because, unlike the terms of the first proposed settlement, the Receiver is required to release only the Estate's claims against 16 directors and officers (rather than all insureds), as well as the judgments already obtained against certain directors and officers.[2] All other former Stanford employees, officers and directors, including Appellants,

---

[2] Oddly, the settlement releases claims only against those directors and officers who were among the most culpable for the Ponzi scheme. And it releases Underwriters from any obligation in connection with the aforementioned judgments for $2 billion and $57 million. This oddity should have been considered when assessing the fairness of the settlement.

## No. 17-10663

remain subject to ongoing or potential litigation by the Receiver once the litigation stay against them is lifted.  Some Appellants assert that their individual costs of defending the Receiver's ongoing actions already exceed $10,000.  But the bar orders prevent them from suing the Underwriters for their costs of defense and indemnity under the insurance policies, even though they are coinsured, or for extra-contractual or statutory claims.

The Receiver moved for approval of the settlement and entry of the bar orders.  The district court directed notice to all interested parties, and received objections from several third parties, including Appellants.  The court heard arguments of counsel regarding the settlement, but it refused to allow parties to offer evidence or live testimony or engage in cross-examination.  After the hearing, parties were permitted to file additional declarations or affidavits.

The district court approved the settlement and bar orders, denied all objections, and approved the payment of $14 million of attorney fees to Receiver's counsel.  Separate Final Judgments and Bar Orders were entered in each action pending before it relating to the Stanford Entities and in Appellant Haymon's and Appellant Alvarado's separate lawsuits against the Underwriters.  The district court rejected all post-trial motions.

A more complete discussion of the court's findings will follow, but in general, the court found that the settlement resulted from "vigorous, good faith, arm's-length, mediated negotiations" and concluded that the settlement was "in all respects, fair, reasonable, and adequate, and in the best interests of all Persons claiming an interest in, having authority over, or asserting a claim against Underwriters, Underwriters' Insureds, the Stanford Entities, the Receiver, or the Receivership Estate."  The court further found that the settlement and bar orders were "fair, just, and equitable,"  and it rejected the Appellants' due process claims based on their exclusion from settlement talks and the lack of an evidentiary hearing.  While the court recognized that the

No. 17-10663

bar orders discriminate between a few Stanford officers and the Appellants, it reasoned that "on balance the unfairness alleged by the Objectors is either mitigated by other circumstances or simply outweighed by the benefit of the settlement in terms of fairness, equity, reasonableness, and the best interests of the receivership."

The Appellants fall into three categories. The McDaniel Appellants and "Alvarado"[3] Appellants are former Stanford managers or employees from offices around the country ("Employees") who seek contractual coverage under the insurance policies and press extra-contractual claims against the Underwriters, including for bad faith and statutory violations of the Texas Insurance Code. Appellant Cordell Haymon ("Haymon") was a member of Stanford Trust Company's Board of Directors who settled the Receiver's claims against him for $2 million before the instant global settlement was reached, and in return received the express right to pursue Underwriters for policy coverage and extra-contractual claims. Finally, the Louisiana Retirees/Becker Appellants ("Retirees") are former Stanford investors who sued Stanford brokers covered by the insurance policies and seek to recover from the Underwriters directly pursuant to the Louisiana Direct Action Statute, La. Rev. Stat. 22:1269.

Each group of Appellants raises different challenges to the court's approval of the settlement and bar orders. They appeal from the district court's order denying their objections to the proposed settlement, the Final Bar Order,

---

[3] While Alvarado was originally a party to this appeal, he withdrew his individual appeal on April 19, 2018. The other employees to that action remain as appellants and will be denominated, for the sake of convenience, Alvarado Appellants.

No. 17-10663

and the Order Approving Attorneys' Fees[4] for the Receiver's counsel. The Stanford Employees additionally appeal the Order denying their new trial motion, and Haymon appeals from the Order denying his motion for reconsideration. After explaining the principles that govern the court's management of the Receivership, we will analyze each set of Appellants' objections.

## STANDARD OF REVIEW

A district court's entry of a bar order, like other actions in supervising an equity receivership, is reviewed for abuse of discretion. *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982); *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008). A district court's determination of the fairness of a settlement in an equity receivership proceeding is reviewed for an abuse of discretion. *Sterling v. Stewart*, 158 F.3d 1199, 1202 (11th Cir. 1998) ("Determining the fairness of the settlement [in an equity receivership] is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion."). There is no abuse of discretion where factual findings are not clearly erroneous and rulings are without legal error. *Marlin v. Moody Nat. Bank, N.A.*, 533 F.3d 374, 377 (5th Cir. 2008). A district court's denial of a Rule 59 motion for a new trial or to alter or amend a judgment also is reviewed for an abuse of discretion. *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). This Court reviews *de novo* a district court's application of exceptions to the Anti–Injunction Act as a question of law. *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269 (5th Cir. 2009).

---

[4] The amount and propriety of the Receiver's very high fee request is not substantively briefed by any party and is therefore waived, except to the extent that on remand the fee ought to be reconsidered in light of this opinion.

No. 17-10663

**DISCUSSION**

**I.    General Receivership Principles**

A district court has broad authority to place assets into receivership "to preserve and protect the property pending its final disposition." *Gordon v. Washington*, 295 U.S. 30, 37, 55 S. Ct. 584 (1935); *see also Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 302 (4th Cir. 2001) ("the district court has within its equity power the authority to appoint receivers and to administer receiverships") (citing Fed. R. Civ. P. 66).  The primary purpose of the equitable receivership is the marshaling of the estate's assets for the benefit of aggrieved investors and other creditors of the receivership entities.  *See SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).  Receivers appointed by a federal court are directed to "manage and operate" the receivership estate "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  28 U.S.C. § 959(b).

In general, the Receiver has wide powers to acquire, organize and distribute the property of the receivership.  A properly appointed receiver is "vested with complete jurisdiction and control of all [receivership] property with the right to take possession thereof."  28 U.S.C. § 754.  The Receiver is obliged to allocate receivership assets among the competing claimants according to their respective rights and, in this case, under the laws of Texas, where the Stanford Financial Group was headquartered.  The district court ruled, in a 2009 order that was not appealed, that the insurance policies and proceeds are property of the estate subject to the court's exclusive *in rem* jurisdiction.

Once assets have been placed in receivership, "[i]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."  *Safety Fin.*,

11

674 F.2d at 372–73 (citing *SEC v. Lincoln Thrift Assoc.*, 577 F.2d 600, 606 (9th Cir. 1978)).  This discretion derives not only from the statutory grant of power, but also the court's equitable power to fashion appropriate remedies as "ancillary relief" measures.  *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  Courts have accordingly exercised their discretion to issue bar orders to prevent parties from initiating or continuing lawsuits that would dissipate receivership assets or otherwise interfere with the collection and distribution of the assets.  *See SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions.").  Receivership courts, like bankruptcy courts, may also exercise discretion to approve settlements of disputed claims to receivership assets, provided that the settlements are "fair and equitable and in the best interests of the estate." *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015) (citing *Tri–State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008)).

Neither a receiver's nor a receivership court's power is unlimited, however.  *See Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S. Ct. 1858, 1878 (1971) ("The remedial powers of an equity court must be adequate to the task, but they are not unlimited.").  Courts often look to the related context of bankruptcy when deciding cases involving receivership estates.  The district court here acknowledged that the purpose of bankruptcy receiverships and equity receiverships is "essentially the same—to marshal assets, preserve value, equally distribute to creditors, and, either reorganize, if possible, or orderly liquidate." *Janvey v. Alquire*, No. 3:09-cv-0724, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014); *see also SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated

assets"). That their purpose is the same "makes sense" and reflects their shared legal heritage, since "federal equity receiverships were the predecessor to Chapter 7 liquidations and Chapter 11 reorganizations." *Alquire*, 2014 WL 12654910, at \*17 (citing *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 221, 56 S. Ct. 412, 414 (1936)). The district court also recognized that "[i]n this particular case, the purpose and objectives of the receivership, as delineated in the Receivership Order, closely reflect the general purpose shared by the Bankruptcy Code and federal equity receiverships," and it concluded that "[u]ltimately, this particular receivership is the essential equivalent of a Chapter 7 bankruptcy." *Id.* at \*18.

Unfortunately, two interrelated limitations on the Stanford receivership were downplayed by the district court in its approval of the settlement and bar orders. Both derive from the broader principle that the receiver collects and distributes only assets of the entity in receivership. The first applies to the Receiver's standing: "[l]ike a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue *only to redress injuries to the entity in receivership*, corresponding to the debtor in bankruptcy and the corporation of which the plaintiffs are shareholders in the derivative suit." *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (emphasis added) (citing, *inter alia*, *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S. Ct. 1678 (1972)). The *Scholes* case involved an SEC receivership, but *Caplin*, on which it relied, was a Supreme Court decision in a Chapter X reorganization case. This court endorsed the *Scholes* limitation as applied to this receivership in *Janvey v. Democratic Senatorial Campaign Comm., Inc.* ("*DSCC*"), 712 F.3d 185, 190–93 (5th Cir. 2013). And following *Caplin,* a sister circuit held, "a trustee, who lacks standing to assert the claims of creditors, equally lacks standing to settle them." *DSQ Prop. Co., Ltd. v. DeLorean,* 891 F.2d 128, 131 (6th Cir. 1989); s*ee also Wuliger v. Mfr's. Life Ins. Co.,* 567 F.3d 787, 794 (6th

Cir. 2009) ("Because the receivership entities all would have lacked standing, and because of the rule that receivers' rights are limited to those of the receivership entities, the Receiver also lacked standing [to sue for misrepresentations by brokers to defrauded investors].").

The second limitation, arising from the district court's *in rem* jurisdiction, is that the court may not exercise unbridled authority over assets belonging to third parties to which the receivership estate has no claim. Put another way, in the course of administering this receivership, this district court previously rejected a broad reading of 28 U.S.C. § 754 that suggested the court's *in rem* jurisdiction over the property would necessarily reach every *claim* relating to that property. *See Rishmague v. Winter*, No. 3:11-cv-2024-N, 2014 WL 11633690, at *2 (N.D. Tex. Sept. 9, 2014).

Thus, this court and others have held that a bankruptcy court may not authorize a debtor to enter into a settlement with liability insurers that enjoins independent third-party claims against the insurers. *See, e.g., Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) (refusing to countenance a bankruptcy court's authority to enforce a settlement prohibiting third-party bad faith insurance claims because the claims were not property of the bankruptcy estate). Similarly, "if [the coinsureds'] portion of the [insurance] Proceeds is truly *not* property of the Estate, then the bankruptcy court has no authority to enjoin suits against the [coinsureds]." *In re Vitek*, 51 F.3d 530, 536 (5th Cir. 1995); s*ee also In re SportStuff, Inc.,* 430 B.R. 170, 175 (B.A.P. 8th Cir. 2010) (bankruptcy court lacked jurisdiction or authority to impair or extinguish independent contractual rights of vendors that were additional insureds under the debtor's policies). As these cases illustrate, bankruptcy courts lack "jurisdiction" to enjoin such claims.

The prohibition on enjoining unrelated, third-party claims without the third parties' consent does not depend on the Bankruptcy Code, but is a maxim

of law not abrogated by the district court's equitable power to fashion ancillary relief measures.   Contrary to the Receiver's assertion, the fact that the bankruptcy statute, 28 U.S.C. § 1334(b), limits jurisdiction to proceedings "arising in or related to" bankruptcy cases does not diminish the application of *Zale* or *Vitek* to equity receiverships.   As noted, bankruptcy and equity receiverships share common legal roots.[5]  *See In re Davis,* 730 F.2d 176, 183–84 (5th Cir. 1984) (the Bankruptcy Code arms bankruptcy courts with broad powers analogous to a court in equity).  Moreover, to justify its decision denying bankruptcy court jurisdiction over third-party claims, the court in *Zale* quoted the Supreme Court in a civil rights class action case: "[o]f course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors . . . ." *Zale*, 62 F.3d at 757 n.26 (citing *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 529, 106 S. Ct. 3063, 3079, (1986)).[6]  All of

---

[5] Modern bankruptcy reorganization law originated with Section 77B of the Bankruptcy Act of 1934, the purpose of which was to codify best practices in what had formerly been known as equity receiverships. *See Duparquet Huot & Moneuse Co. v. Evans,* 297 U.S. 216, 222–24, 56 S. Ct. 412, 415–17 (1936).  Section 77B(a), in turn, stated that the bankruptcy court's powers are those "which a Federal court would have had it appointed a receiver in equity of the property of the debtor . . . ." *Id.* at 221, 56 S. Ct. at 415.

[6] *Local No. 93* is merely one example of the Supreme Court's rejection of the use of consent decrees to extinguish the claims of non-consenting third-parties, for "[a] voluntary settlement in the form of a consent decree between one [party] and [another party] cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of [parties] who do not join in the agreement.  This is true even if the second group of [parties] is a party to the litigation." *Martin v. Wilks*, 490 U.S. 755, 755–68, 109 S. Ct. 2180, 2181–88 (1989).  Indeed, "[a]ll agree" that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Id.* (citing *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S. Ct. 115, 117 (1940)).

this makes clear that it is not the subject matter or statutory limitations driving this limitation, and federal district courts have no greater authority in equity receiverships to ignore these bedrock propositions, because a "court in equity may not do that which the law forbids." *United States v. Coastal Ref. & Mktg., Inc.,* 911 F.2d 1036, 1043 (5th Cir. 1990).

Rather than reckon with the limits on the Receiver's standing and the court's equitable power, the district court here cited an unpublished Fifth Circuit case, *SEC v. Kaleta*, No. 4:09-cv-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), aff'd., 530 F. App'x. 360 (5th Cir. 2013), to support both the settlement and bar orders. Importantly, *Kaleta* is an unpublished, non-precedential decision of this court. Not only that, but reading it as the district court and Appellees here advocate would mean investing the Receiver with unbridled discretion to terminate the third-party claims against a settling party that are unconnected to the *res* establishing jurisdiction. That is unprecedented. But *Kaleta* is in any event distinguishable and not inconsistent with the above-stated principles. In *Kaleta*, the bar order prevented defrauded investors from suing parties closely affiliated with the entity in receivership after the parties had agreed to make good on their guarantees to the receiver. Moreover, the settling parties would have been codefendants with receivership entities, leading to the possibility of their asserting indemnity or contribution from the estate. The court was forestalling a race to judgment that would have diminished the recovery of all creditors against receivership assets. That bar order protected the assets of the receivership estate, whereas the bar orders before us extend beyond receivership assets.

The Receiver also contends that the district court may permanently enjoin the claims of non-consenting third parties based on general statements about ancillary powers found in SEC cases such as *Wencke* and *Safety*

*Financial Services.* We disagree. These cases stand only for the proposition that, in some circumstances, federal courts may use injunctive measures, such as stays, "where necessary to protect the federal receivership." *See Wencke*, 622 F.2d at 1370; *Safety Fin. Serv.*, 674 F.2d at 372 n.5 (distinguishing *Wencke*, which "involved the much broader question of a federal court's power to enjoin nonparty state actions *against receivership assets*.") (emphasis added). In fact, the court in *Wencke* recognized that its holding was limited to the propriety of staying third-party "proceedings *against a court-imposed receivership*." *Wencke*, 622 F.2d at 1371 (emphasis added). Correctly read, these cases explain that *in rem* jurisdiction over the receivership estate imbues the district court with broad discretion to shape equitable remedies necessary to protect the *estate*.[7] They do not support that a district court's *in rem* jurisdiction over the estate may serve as a basis to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate.

The Appellees emphasize the recent decision *SEC v. DeYoung,* 850 F.3d 1172 (10th Cir. 2017), as supporting their argument that an equity court's permanent bar order against third parties is appropriate when tied to a settlement that secures receivership assets. Like many of their arguments, however, this assertion proves too much. *DeYoung* is a narrow and deliberately fact-specific opinion. *See DeYoung*, 850 F.3d at 1182–83. The court approved a bar order preventing three defrauded IRA Account holders (out of over 5,500 victims) from pursuing claims against the depository bank in which the accounts had been illegally commingled. Notably, however, the court demonstrated that (1) the claims of the barred investors precisely mirrored

---

[7] *See also SEC v. Stanford Int'l Bank, Ltd.,* 424 F. App'x. 338, 340 (5th Cir. 2011) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation *to preserve the property placed in receivership* pursuant to SEC actions.") (emphasis added).

claims that had been asserted and settled by the receiver; (2) averted a duplicative lawsuit whereby the bank could have asserted its contract right to indemnity from the receivership assets; and (3) provided the account holders with a claim against the receivership estate. The court simply channeled redundant claims into the receivership while preventing diminution of receivership assets.

Returning to the broad issue in this case, whether the district court abused its discretion in approving the settlement and bar orders, there are two subparts to the question. The first is whether the district court's equitable power to fashion ancillary relief could be used to bar claims by insureds to proceeds of the Underwriters' policies, which are property within the receivership estate. The second is whether the court's equitable power may be used to bar third-party claims, like tort or statutory claims, against the Underwriters but unconnected to the property of the Receivership. The answers to these questions vary according to the Appellants' claims. Texas law, unless otherwise noted, applies by virtue of 28 U.S.C. § 959(b).

## II. Party Contentions

### a. Appellants Alvarado and McDaniel

The McDaniel and Alvarado Appellants are all former Stanford managers or employees who are being sued by the Receiver for clawbacks of their compensation via the Receiver's Indirect Claims on the Underwriters' policies. Appellants seek coverage under the insurance policies, which Underwriters have denied, to defend against these lawsuits and indemnify their losses. Appellants object to the settlement and bar orders on numerous grounds. From a practical standpoint, the settlement will exhaust the Underwriters' policy proceeds, leaving these Appellants wholly uninsured against the Receiver's lawsuits. The bar orders, moreover, prevent them from pursuing against the Underwriters not only breach of contract claims for

violating the duties to defend and indemnify, but also statutory and tort claims that, if successful, would not be paid from policy proceeds and would not reduce Receivership assets.

The district court's rejection of Appellants' objections rested generally on its conclusion that the settlement and bar orders are fair, equitable, reasonable and in the best interests of the receivership estate. As has been noted, the court cited only the *Kaleta* case, affirmed by a non-precedential decision of this court, in support of its conclusions. The court's reasoning invoked the perceived necessity of a settlement, together with the bar orders, to resolve fairly and efficiently the competing claims of the Receiver and Underwriters about policy coverage and assure the maximum recovery for Stanford's defrauded investors. Without the bar orders, the court stated, Underwriters would not settle. The court pointedly refused to decide whether policy exclusions apply to the Appellants' coverage claims. Even if such exclusions barred coverage, the court added, then the Receiver might also be barred by the same exclusions and all potential benefit of the settlement would be lost. In sum, the Appellants would lose out no matter what: their claims could be barred by exclusions, held uninsurable, or the Receiver, having the right to settle, would exhaust the proceeds first.[8] The balance of benefits to the receivership estate against Appellants' admitted losses weighed in favor of the court's approving the settlement and bar orders.

---

[8] Implicit in the district court's reference to the Receiver's right to settle and exhaust all the policy proceeds is apparently its reliance on Texas law, which allows an insurer to settle with fewer than all of its co-insureds when the policy proceeds are insufficient to satisfy all of the claims. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1929); *Pride Transp. v. Cont'l Cas. Co.*, 511 F. App'x 347, 351 (5th Cir. 2013); *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 765–68 (5th Cir. 1999); *see also Tex. Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994). The court, however, never referenced these cases.

No. 17-10663

In the course of explaining its decision, however, the court made some errors. First, its broad statement that the settlement would fail without the bar orders did not account for the fact that the parties had mediated a prior settlement that required no bar orders against these Appellants because the Receiver had agreed to release all of its claims against them. "Global peace" there was achieved not by bar orders, but by the Receiver's agreeing to drop the Indirect Claim suits. The final settlement required the broad bar orders only because the Receiver, for whatever reason, insisted that it must continue to pursue hundreds of clawback actions.[9] The court's broad statement also neglected to note that, despite the Receiver's overall insistence to the contrary, the Receiver nonetheless released its claims against sixteen former Stanford officers and employees in the final settlement.

Second, the court, perhaps inadvertently, did not address the fact that Appellants were foreclosed from sharing in the assets recovered by the Receiver by filing claims against the estate.

Third, the court failed to distinguish between the Appellants' two separate types of claims – contractual claims for defense and indemnity payable (if successful) from policy proceeds in competition with investors' claims to the Receivership assets; and independent, non-derivative, third-party claims for tort and statutory violations, which would be satisfied (if successful) out of Underwriters' assets. In this connection, the court also undervalued the Appellants' claims for indemnity by disregarding *Pendergest-Holt*. In that case, this court held that the D&O policies should provide up-front reimbursement of defense costs in Stanford insureds' criminal cases

---

[9] Indeed, when the Underwriters moved the district court to enforce the terms of the mediated settlement, their motion queried the benefits to be reaped, other than in the Receiver's legal fees, from these time-consuming suits against relatively poor former employees targeted by the Receiver.

20

pending a separate judicial proceeding to resolve the coverage question. *Pendergest-Holt v. Certain Und. at Lloyd's of London,* 600 F.3d 562, 572–74 (5th Cir. 2010). Although carefully hedged, this decision offered Appellants the prospect of possible, temporary relief for their mounting defense costs and was not "wholly inapplicable" to the decision concerning the settlement and bar orders. But in any event, the court did not analyze the ramifications of Appellants' distinct claims against Receivership assets and claims wholly independent of receivership assets.

### i. Contractual Claims for Defense and Indemnity

Reviewing first the settlement and bar of Appellants' contractual claims against the policy proceeds that are property of the receivership estate, we find that the court abused its discretion by extinguishing Appellants' claims to the policy proceeds, while making no provision for them to access the proceeds through the Receiver's claims process. This undermines the fairness of the settlement.

As the district court observed, some settlement with the Underwriters was prudent because of the sheer magnitude of claims far beyond the policies' coverage, and because the scope of coverage, dependent on multiple, insured-specific factual and legal questions, is unclear. What is clear in Texas law, as conceded by Appellants, is that an insurer may settle with fewer than all of its co-insureds when the policy proceeds are insufficient to satisfy all of the claims. *See G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex. 1929); *Pride Transp. v. Continental Cas. Co.,* 511 F. App'x 347, 351 (5th Circuit 2013); *Travelers Indem. Co. v. Citgo Petroleum Corp.,* 166 F.3d 761, 765–68 (5th Cir. 1999); *see also Farmers Insurance Co. v. Soriano,* 881 S.W.2d 312, 315

(Tex. 1994).[10]  Although the district court did not cite these cases, its ruling squares with them and supports its cost/benefit calculation for the Receiver/Underwriters' settlement to the detriment of Appellants' contractual claims.

But not only did  the settlement expressly foreclose the Appellants from sharing in the insurance policy proceeds of which they are coinsureds, the Appellants are not even allowed to file claims against the Receivership estate. Unlike the Stanford investors and the Receiver's attorneys, who can pursue restitution through the Receiver's claims process, Appellants have no access to the claims process.  The Settlement Agreement specifically restricts payment of the Proceeds to the Receivers' attorneys and the Stanford investors and specifically excludes Stanford employees and management, including Appellants.  For these Appellants, should the Receiver continue to pursue them, their claims against the Underwriters offer the only avenue of recovery. This alone serves to distinguish this case from *Kaleta*, which approved the settlement because, inter alia, the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'"  *See Kaleta*, 530 F. App'x at 362–63 (alteration in original).  Barring Appellants' claims to coverage under their insurance policies by claiming the proceeds of these policies as property of the Receivership, *and then* barring Appellants' from accessing even a portion of these proceeds through the Receivership claim process, undermines the fairness of the settlement.

---

[10] *Soriano* may not squarely apply to the extent that the settlement does not, on its face, exhaust the policy limits.  But this uncertainty in the law meant that settlement between the Receiver and the Underwriters was fair game.

No. 17-10663

The district court and Receiver lacked authority to dispossess claimants of their legal rights to share in receivership assets "for the sake of the greater good." The court's duty, as previously described, is to assure that all claimants against the Receivership have a reasonable opportunity to share in the estate's assets. Given the numerous exclusions to policy coverage,[11] the Appellants' entitlement to proceeds may appear weak, but the court disclaimed deciding coverage issues, and the Appellants have identified several reasons, in addition to *Pendergest-Holt,* why their contractual claims might prevail on final adjudication.[12]

Rather than extinguish the Appellants' contractual claims, the court could have authorized them to be filed against the Receivership in tandem with the Stanford investors' claims. Such "channeling orders" are often employed to afford alternative satisfaction to competing claimants to receivership assets while limiting their rights of legal recourse against the assets. *See, e.g., DeYoung,* 850 F.3d at 1182; *see also Kaleta,* 530 F. App'x at 360 (approving claims filing in receivership for barred litigants). In any event, the court may have intended to channel the Appellants' claims here but simply overlooked their omission from the extant procedures.[13]

---

[11] The myriad of contested policy exclusions include the insured versus insured, money laundering, fraud, intentional corporate or business policy, and prior knowledge exclusions.

[12] Appellants explain that a significant number of their group have no personal liability, and, inferentially, should not be subject to policy exclusions, because they did not sell Stanford CDs to investors. Further, because the Receiver's claims against the Appellants are not derivative, any recovery from the proceeds would not at all reduce or offset the Appellants' liability for fraudulent transfers. Finally, Appellants assert viable defenses to the clawback actions based, in part, on Texas law in this Receivership. *See Janvey v. Golf Channel, Inc.,* 487 S.W.3d 581, 582 (Tex. 2016) (recognizing defense to fraudulent transfer of reasonably equivalent value received).

[13] The Receiver and Underwriters contend that in lieu of other modes of compensation through the receivership, these Appellants have received "benefits," however small, from the settlement because the insurance proceeds that have gone into the receivership estate offset

23

No. 17-10663

*ii. Extracontractual Claims for Tort and Statutory Violations*

By ignoring the distinction between Appellants' contractual and extracontractual claims against Underwriters, the district court erred legally and abused its discretion in approving the bar orders.[14]   These claims, including common law bad faith breach of duty and claims under the Texas Insurance Code, lie directly against the Underwriters and do not involve proceeds from the insurance policies or other receivership assets.[15]   These damage claims against the Underwriters exist independently; they do not arise from derivative liability nor do they seek contribution or indemnity from the estate.[16]   As the preceding discussion explains in detail, receivership courts have no authority to dismiss claims that are unrelated to the receivership estate.   That the district court was "looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness."   *Zale*, 62 F.3d at 754

their potential liability in the Receiver's and other suits.  The district court made no such finding, and we see no basis in the record for it.

[14] The Receiver and Underwriters would pretermit any such distinction by contending that unless the Appellants had valid contractual claims for insurance from the Underwriters' policies, they could not bring extracontractual claims.  This may well be accurate.  The district court, however, refused to rule on the viability of Appellants' contractual claims, and we need not undertake that task here.  The basis of settlement for all concerned is to avoid tedious litigation of insurance coverage claims.

[15] This principle has been described above in the related context of bankruptcy.  *See Matter of Zale Corp.*, 62 F.3d 746, 756–57 (5th Cir. 1995); *Matter of Vitek, Inc.*, 51 F.3d 530, 538 (5th Cir. 1995); *In re Sportstuff, Inc.*, 430 B.R. 170, 178–79 (B.A.P. 8th Cir. 2010); *see also Matter of Buccaneer Res., LLC*, 912 F.3d 291, 293–97 (5th Cir. 2019) (explicating the difference between derivative and non-derivative injuries and holding that a tortious interference claim by a former company president against the outside lenders is non-derivative and separate from the bankruptcy estate).

[16] *See SEC v. DeYoung,* 850 F.3d 1172; *In re Heritage Bond Litig.,* 546 F.3d 667, 680 (9th Cir. 2008) (discussing settlement of a securities class action and distinguishing between claims for codefendant contribution and independent claims against settling defendants; former could be dismissed by bar order, but latter claims could not be).

(alteration in original) (citing *United States v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.)).

As discussed above, the Receiver lacked standing to settle independent, non-derivative, non-contractual claims of these Appellants against the Underwriters. *See DSCC,* 712 F.3d at 190, 193 (receiver "has standing to assert only the claims of the entities in receivership, not the claims of the entities' investor-creditors [coinsureds] . . ."). Of course, the Receiver and Underwriters were, as Appellants' counsel colorfully described, all too happy to compromise at the expense of Appellants' rights. The court purported to justify this result by claiming that "the bar orders are not settling claims, they are enjoining them." No matter the euphemism, a permanent bar order is a death knell intended to extinguish the claims, which are a property interest, however valued, of the Appellants.

Moreover, in approving the settlement and bar orders against these Appellants, the district court overlooked problems inherent in the settling parties' positions. The Underwriters' position was in conflict with the Appellants: by means of the bar orders, the Underwriters limited their exposure to further costly and time-consuming litigation over Appellants' non-derivative extracontractual claims against them. The Receiver was enabled by the settlement and bar orders to place Appellants in a vise: preserving his ability to sue Appellants for clawbacks even as the agreement stripped Appellants' access to any recompense from the Underwriters.[17] These

---

[17] The mediated settlement, in contrast, averted these conflicts of interest with the Receiver's release of claims against Appellants offsetting the Underwriters' potential extracontractual liability.

problems cast grave doubt on the fairness and equity of the settlement and bar orders reached without Appellants' participation.[18]

In sum, although we sympathize with the impetus to settle difficult and atomized issues of insurance coverage rather than dissipate receivership assets in litigation, the settlement and bar orders violated fundamental limits on the authority of the court and Receiver. The court and Receiver could not abrogate contractual claims of these Appellants to proceeds of Underwriters' policies without affording them an alternative compensation scheme similar, if not identical, to the claims process for Stanford investors. The court could not authorize the Receiver and Underwriters to compromise their differences while extinguishing the Appellants' extracontractual claims against Underwriters. Equity must follow the law, which here constrains the court's and Receiver's authority to protecting the assets of the receivership and claims directly affecting those assets.[19]

### b.    Appellant Cordell Haymon

Like the Alvarado and McDaniel Appellants, Appellant Cordell Haymon, a member of Stanford Trust Company's board of Directors, was targeted by the

---

[18] When compared with *DeYoung,* 850 F.3d at 1182–83, the unsustainability of the settlement and bar orders here is manifest. Unlike that case, the extracontractual claims of these Appellants do not parallel those of the Receiver, Underwriters possess no contribution/indemnity claim against the receivership estate, and Appellants have been provided no channel to assert claims in the receivership.

[19] We reject Appellants' due process claims against the settlement and bar orders. They contend that because they "had an interest in" the outcome of the settlement, and the Bar Order "fully and finally adjudicates Appellants' independent state law contract and tort claims," due process required at least the ability to introduce evidence at the hearing. McDaniel presses other constitutional claims. But Appellants were provided notice of the settlement hearing, were able to fully brief their position and provide affidavits, and they have offered nothing more on appeal. Although excluded from the settlement negotiations, they have shown no legal requirement that they be allowed to participate in a settlement resolving claims for reimbursement against the limited policy proceeds. The applicable Texas law allows insurers to settle with fewer than all of the insureds in such circumstances. Appellants' due process arguments fail, and McDaniel's other claims are meritless.

No. 17-10663

Receiver and sought coverage of his defense costs under the insurance policies. After the Underwriters denied his claim for coverage, he settled the Receiver's fiduciary duty breach suit for $2 million. Haymon asserts that he relied on the language of his settlement agreement, which specifically authorized the continuation of his suit against the Underwriters. Only a few months later, however, the final proposed settlement undid his expectations of recovery from the Underwriters. Haymon requested to intervene in the initial coverage dispute between Underwriters and the Receiver, and he filed objections to the proposed settlement. He argues now that the district court erred in barring all of his contractual and extracontractual tort and statutory claims against the Underwriters.

To the extent that Haymon's claims mirror those of Alvarado and McDaniel, the same results follow. The district court acted within its authority to bar Haymon's claim for contractual defense and indemnity under the insurance policies, but some alternate compensation mode from the receivership estate is required, and the court could not bar his extracontractual claims against the Underwriters. However, the ultimate evaluation of Haymon's claims may differ from that of the other Appellants for two reasons, which the district court should assess on remand. First, because his insurance coverage claim was liquidated before the final settlement ($2 million potential indemnity and $1.5 million defense costs) it was ripe for judicial determination under *Pendergest-Holt*.[20] Second, Haymon received a bar order, perhaps valuable to him, against any further litigation concerning his involvement with Stanford entities.

---

[20] Finally, as noted in regard to the other Appellants, Haymon was afforded the opportunity, and availed himself of the ability to press his constitutional objections to the settlement and bar orders. There was no failure of due process and his other vaguely identified constitutional objections are meritless.

No. 17-10663

### c.    **Appellant Louisiana Retirees**

Unlike the foregoing Appellants, the Louisiana Retirees are not coinsureds under the insurance policies, and they are not being pursued in Indirect Claim actions by the Receiver. Retirees have assiduously pursued securities law claims against certain Stanford brokers and the Underwriters, as insurers for those brokers, under the Louisiana Direct Action Statute, La. R.S. 22:1269.

First, the parties dispute the meaning of the bar order and the extent to which it bars the Retirees' claims. The Receiver argues that the bar order applies only to claims against the Underwriters and the Underwriters' *Released Parties*, defined as the officers, agents, etc. of Underwriters, and expressly excluding the officers, directors, or employees of Stanford Entities. Retirees argue that it enjoins them from pursuing the Stanford Claims, defined as "any action, lawsuit or claims brought by any Stanford Investor against Underwriters [or] . . . *Underwriter's Insureds*." In turn, Underwriters' Insureds are defined as "any person that shall be an officer and director of any Stanford Entities . . . [or] any employee of any Stanford Entities." On remand, it would be appropriate for the district court to determine and clarify the meaning of the bar order as to the Retirees, keeping in mind that the district court may not enjoin any claims by Retirees against the brokers that do not implicate the policy proceeds.

Second, the Retirees' claims under the Louisiana direct action statute unequivocally implicate the policy proceeds and therefore assets of the receivership. The statute specifies that an action can be brought "within the terms and limits of the policy by the injured person." La. Rev. Stat. 22:1269(A), (C), (D). It "does not create an independent cause of action against the insurer[;] it merely grants a procedural right of action against an insurer where the plaintiff has a substantive cause of action against the insured." *Soileau v.*

28

*Smith True Value & Rental*, 144 So. 3d 771, 780 (La. 2013). As such, the Receiver could settle with the Underwriters notwithstanding the direct action claim just as he could settle regardless of the Employee Appellants' contractual claims to policy proceeds. Further, as former investors in the Stanford entities, the Retirees were afforded a means of filing claims apart from the direct action suit, and many have availed themselves of that opportunity. Consequently, the Retirees' direct action suit against the Underwriters amounts to a redundant claim on receivership assets.

Nevertheless, the Retirees assert several arguments that have no bearing on the permissibility of the settlement and bar order as to them. They contend first that the settlement and bar order conflict with the Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), which they characterize as "acknowledg[ing] the Louisiana Retirees' rights to bring their state law securities claims in Louisiana state court." But *Troice* held only that the Securities Litigation Uniform Standards Act did not preempt the Louisiana Appellants' state court claims. The Court's ruling did not bear on the merits of or procedure for the Retirees' state law case.

Second, they contend that *DSCC*, 712 F.3d at 185, forbids giving the receiver the right to "control the settlement of a claim it does not own." That is certainly correct according to our previous discussion, but here, the Receiver had standing to pursue *its own* claims as coinsured under the Underwriters' policies, such claims perfected the Receiver's interest in a valuable asset, and Texas law provided the right to settle them even at the expense of the Retirees' direct action claims.

The Retirees argue that the district court should have first determined the disputed legal questions about the magnitude of, and legal rights to, the policy proceeds before approving the settlement and bar orders under *In re Louisiana World Exposition, Inc.,* 832 F.2d 1391 (5th Cir. 1987). This

argument simply misreads that case.  The court in *Louisiana World* explicitly distinguished the facts before it from cases involving coinsureds with equal claims to the policy proceeds.  Moreover, at least one disputed policy – the Fidelity Bond – covers only the Receivership entities.[21]  It was not an abuse of discretion for the district court to hold that equity favored avoiding costly litigation and dissipation of receivership assets by allowing the Receiver, a coinsured with equal claim to the policy proceeds, to settle with the Underwriters.  Avoiding protracted legal examination of the policy exclusions, which could just as easily bar Retirees and others from the policy proceeds, was precisely the point of the settlement.

Fourth, Retirees assert that the Anti-Injunction Act, 28 U.S.C. § 2283 ("AIA"), prevented the court from issuing its bar orders.  This argument has no merit.   Under the AIA, "any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to [the Anti-Injunction Act] if it is to be upheld." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287, 90 S. Ct. 1739, 1743 (1970).    The specific exceptions are express authorization by an Act of Congress, where necessary in aid of the court's jurisdiction, or to protect or effectuate the court's judgments.  *Id.* at 288, 90 S. Ct. at 1743–44.  The AIA does not prohibit the settlement and bar order because, pertinent to the Retirees, they cover only those claims implicating the insurance policy proceeds and so were necessary in aid of the district court's jurisdiction over those proceeds.   The district court has exclusive *in rem* jurisdiction over the policy proceeds and permanent bar orders have been approved as parts of settlements to secure receivership assets.  *See, e.g.,* S*EC*

---

[21] As with the other policies, the Underwriters and Receiver dispute the scope of coverage and exclusions of the Fidelity Bond, and whether the Receiver may access the proceeds, but there is no argument that the Retirees may access these proceeds.

No. 17-10663

*v. Parish,* No. 2:07-CV-00919-DCN, 2010 WL 8347143 (D.S.C. Feb. 10, 2010) ("[T]he bar order is necessary to preserve and aid this court's jurisdiction over the receivership estate, such that the Anti-Injunction Act would not prohibit the bar order even if there were pending state court actions, which there are not.").

For these reasons, the settlement and bar orders did not interfere with or improperly extinguish the Retirees' rights.

## CONCLUSION

For the foregoing reasons, we **VACATE** the district court's orders approving the settlement and bar orders and **REMAND** for further proceedings consistent with this opinion.[22]

---

[22] Vacatur and remand will probably necessitate the court's reconsideration of the attorneys' fee award to the Receiver's counsel.

31